UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD PRYOR,

    Plaintiff,                                                    Hon. Ellen S. Carmody

v.                                                              Case No. 1:04 CV 257

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.
_____/

## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act.  On August 3, 2004, the parties consented to proceed in this Court for all further proceedings, including an order of final judgment.  28 U.S.C. § 636(c)(1).  By Order of Reference, the Honorable Richard Alan Enslen referred the matter to this Court.  (Dkt. #9).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive.  The Commissioner has found that Plaintiff is not disabled within the meaning of the Act.  For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is limited to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision, and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). The standard

affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 51 years of age on the date of the ALJ's decision. (Tr. 43). He possesses an advanced college degree and worked previously as a resource specialist performing environmental analyses of public housing construction sites. (Tr. 82, 87, 516, 521-22).

Plaintiff applied for benefits on July 18, 2000, alleging that he had been disabled since December 2, 1982, due to depression, anxiety, post-traumatic stress disorder, obesity, diabetes, hypertension, edema, arthritis, and narcolepsy. (Tr. 75-77, 81, 492-93). Plaintiff's application was denied, after which time he requested a hearing before an ALJ. (Tr. 58-74, 495-510). On June 14, 2002, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Rich Riedl. (Tr. 511-57). In a written decision dated July 12, 2002, the ALJ determined that Plaintiff was not disabled. (Tr. 42-52). The Appeals Council declined to review the ALJ's decision, rendering it the Commissioner's final decision in the matter. (Tr. 5-7). Plaintiff then initiated this appeal pursuant to 42 U.S.C. § 405(g).

Plaintiff's insured status expired on December 31, 1988. (Tr. 43). Plaintiff does not challenge this determination. Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to December 31, 1988. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **MEDICAL HISTORY**

On May 19, 1983, Plaintiff participated in a psychological evaluation conducted by J. Keith Ostien, Ph.D. (Tr. 472-74). Plaintiff reported that he was experiencing difficulty sleeping, emotional instability, and weight gain. (Tr. 472). Plaintiff attributed his difficulties to the "conflicts" he experienced during his recent employment with the State of Michigan. (Tr. 472-73). According to Plaintiff, he "discovered some activity on the part of his superiors that he felt was illegal." (Tr. 475). Plaintiff reported his discovery, but felt that the people to whom he reported this alleged wrongdoing "were not interested" in pursuing the matter. *Id.*

The doctor reported that Plaintiff was "bright and very verbally skilled." (Tr. 473). While Plaintiff exhibited preoccupation with his previous work circumstance, he "did not exhibit evidence of a broadly-based delusional system." Plaintiff acknowledged experiencing depression, but denied experiencing hopelessness or suicidal ideation. *Id.* Dr. Ostien concluded that Plaintiff was experiencing "stress and depression. . .in response to the difficulties regarding his employment situation" for which therapy was recommended. (Tr. 474).

From May 1983 through June 1984, Plaintiff participated in weekly therapy sessions with Dr. Pedro Ojeda. (Tr. 475, 479). From June 1984 through October 1986, "except for occasional extra visits when he was confronted by a crisis," Plaintiff participated in therapy on a monthly basis. (Tr. 479). In a November 10, 1986 report, Dr. Ojeda stated that Plaintiff "has made some strides. . .in the area of interpersonal relationships." (Tr. 480). The doctor reported that while Plaintiff remains "limited" in his ability to work, he has "never seen any signs to indicate that [Plaintiff] suffers a major mental disorder." (Tr. 479). Dr. Ojeda recommended that Plaintiff participate in vocational rehabilitation. (Tr. 480).

Treatment notes dated September 14, 1989 indicate that Plaintiff was no longer experiencing panic attacks. (Tr. 149). On March 9, 1990, Plaintiff reported that he was doing "o.k." (Tr. 147). On July 5, 1990, Plaintiff reported that his panic attacks were "under control" with his medication. (Tr. 129). On October 4, 1990, Plaintiff reported that he was taking swimming and Chinese classes at a local community college. *Id.*

On May 23, 1991, and June 6, 1991, Plaintiff participated in an independent medical evaluation conducted by Dr. David Forsythe. (Tr. 481-85). Plaintiff reported experiencing depression, panic, fear, and paranoia. (Tr. 482). Plaintiff reported that his symptoms were a result of the difficulties he experienced in his previous employment. *Id.* The doctor reported that Plaintiff was "definitely depressed," but also noted that he was pleasant, cooperative, and "rather talkative." (Tr. 483-84). Dr. Forsythe also observed that Plaintiff possessed "above average" intelligence, with an IQ of 120-125. (Tr. 484). Plaintiff was diagnosed with dysthymia.[1] Dr. Forsythe concluded that Plaintiff's "degree of mistrust and social withdrawal would greatly impair his ability to do the type of work that he has been accustomed to doing in the past." *Id.* The doctor offered no opinion as to whether Plaintiff was precluded from performing any other type of work.

On September 25, 1991, Plaintiff reported that he felt "better" and that his depression was "diminished." (Tr. 133). On January 17, 1992, Plaintiff reported that his panic attacks were "relieved" with medication. (Tr. 136). On November 12, 1992, Plaintiff reported that he was going to take a two-month vacation in Cancun. (Tr. 142). He also reported that he had registered for French classes at a local community college. *Id.* An April 11, 1994 report reveals that Plaintiff was

---

[1] Dysthymia is a disorder of mood, less severe than a major depression, marked by a loss of interest in activities previously enjoyed, described by the patient as a feeling of being in the dumps. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* D-171 (Matthew Bender) (1996).

5

working performing repairs on the various investment properties which he had recently purchased. (Tr. 362). On January 19, 1995, Plaintiff reported that he was "hauling wood and doing carpentry" on his various investment properties. (Tr. 152). On October 10, 1995, Plaintiff reported that he was exercising more and mowing the lawns at his several houses. (Tr. 156).

On February 16, 1996, Plaintiff participated in an esophagram, the results of which revealed a "small" hernia with no evidence of reflux. (Tr. 425).

On May 25, 1996, Plaintiff underwent a tonsillectomy, uvulopalatopharyngoplasty, and nasopharyngoscopy to treat obstructive sleep apnea. (Tr. 436).

On March 19, 1999, Plaintiff participated in a nerve conduction/electromyographic examination to evaluate his complaints pain in his neck and left upper extremity. (Tr. 430-32). The examination revealed no evidence of cervical radiculopathy. (Tr. 432). The doctor further reported that Plaintiff exhibited no symptoms of carpal tunnel syndrome. *Id.*

On November 3, 1999, Plaintiff participated in a venous evaluation of his lower extremities, the results of which revealed the presence of an "essentially patent bilateral lower extremity deep venous system." (Tr. 429).

On December 8, 1999, Plaintiff participated in a psychological evaluation performed by Carolyn Lucas, Ph.D. (Tr. 439-41). The purpose of this evaluation was to assess Plaintiff's "motivation for gastric [bypass] surgery," as well as "the likelihood of post-operative compliance with dietary restrictions." (Tr. 439). Plaintiff reported that he was experiencing "increasing physical difficulties" as a result of his recent weight gains. Plaintiff reported that he was presently self-employed developing various investment properties. *Id.* Plaintiff also reported that he "has made a number of trips to Mexico where he can live less expensively, enjoy the sun, and relax." (Tr. 440).

As part of the evaluation, Plaintiff participated in the Minnesota Multiphasic Personality Inventory-II (MMPI-II). (Tr. 440). Plaintiff's responses to this evaluation were consistent with individuals who tend to complain, exhibit defensiveness, use somatization as a defense, and tend to be overly concerned with body functioning. *Id.* Concluding that Plaintiff was "very motivated to regain his health and ability to function better physically," the doctor concluded that Plaintiff was a good candidate for gastric bypass surgery. (Tr. 441).

On May 6, 2000, Plaintiff participated in a psychiatric consultation performed by Dr. David Picone. (Tr. 159-60). Plaintiff reported that he was "feeling overwhelmed" with difficulties he was experiencing attempting to renovate several houses. (Tr. 159). He also reported experiencing decreased energy and stress related to his "uncontrolled blood sugars." Plaintiff reported that he was seeking employment as a Environmental Sciences instructor at a local community college. *Id.* Plaintiff exhibited "normal" posture, gait, and motor activity. (Tr. 160). The results of a mental status examination were unremarkable. Plaintiff was diagnosed with adjustment disorder with mixed emotional features. His GAF score was rated as 53.[2] The doctor concluded that Plaintiff "may benefit from psychopharmacological intervention." *Id.*

On August 15, 2000, Plaintiff was examined by Dr. Eric Goebel. (Tr. 386-87). Plaintiff reported that since undergoing surgery in 1996 his obstructive sleep apnea had "done well," but that he had recently begun to experience "increased apnic events." (Tr. 386). The results of a

---

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 53 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Id.* at 34.

physical examination were unremarkable. (Tr. 386-87). The doctor recommended that Plaintiff participate in another sleep study and undergo a trial usage of a nasal CPAP device. (Tr. 387).

On August 30, 2000, Plaintiff participated in a sleep study, the results of which "demonstrated a severe degree of obstructive sleep apnea." (Tr. 381-85). There was no evidence, however, that Plaintiff suffered from narcolepsy. (Tr. 385).

On December 5, 2000, Plaintiff underwent gastric bypass surgery, following which his "course was pretty much unremarkable." (Tr. 227).

On December 7, 2000, Plaintiff participated in a doppler venous examination of his left lower extremity, the results of which were normal with "no evidence for acute deep venous thrombosis." (Tr. 244).

On January 8, 2001, Plaintiff reported that he was "recovering fine" from his recent surgery and had already lost approximately 40 pounds. (Tr. 287).

On January 27, 2001, Plaintiff participated in a consultive examination performed by Dr. Jalal Ahmed. (Tr. 188-92). Plaintiff identified his "problems" as: (1) stress, (2) sleep disorder, (3) excessive weight gain, (4) high blood pressure, (5) high blood sugar, (6) arthritis, and (7) edema. (Tr. 188). Plaintiff also reported that he suffered post-traumatic stress disorder "four to six years ago" after reporting alleged wrongdoing within the governmental agency for which he was then employed. (Tr. 188-89). Plaintiff reported that he lived with his parents. (Tr. 189). Plaintiff reported that he sleeps 15-18 hours daily and performs "only minimal" household activities. (Tr. 190). Plaintiff exhibited normal gait, posture, and motor activity. He exhibited low self-esteem, but

a mental status examination was otherwise unremarkable. (Tr. 190-91). Plaintiff was diagnosed with an anxiety disorder and his GAF score was rated as 60.[3] (Tr. 191-92).

On February 2, 2001, Dr. Ashok Kaul completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 174-87). Determining that Plaintiff suffered from an adjustment disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments. (Tr. 175-83). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular impairment. (Tr. 184). Specifically, the doctor concluded that Plaintiff suffered mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced repeated episodes of decompensation. *Id.*

On February 7, 2001, Plaintiff was examined by Dr. Sadiq Syed. (Tr. 368-71). Plaintiff reported that he was "feeling good" following his gastric bypass surgery and had lost 15 pounds during the previous month. (Tr. 368). Plaintiff reported that he was not presently working, but indicated that he had been self-employed prior to undergoing surgery. *Id.* The results of an examination were unremarkable. (Tr. 369-70). Plaintiff's blood sugar was 171 which was consistent with "mild" diabetes. (Tr. 370). Plaintiff was referred to a nutritionist regarding his diabetes and gastric bypass surgery. *Id.*

On February 19, 2001, Plaintiff participated in a consultive examination performed by Dr. Thomas Keaveney. (Tr. 193-99). Plaintiff reported that he was disabled due to diabetes and

---

[3] A GAF score of 60 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

9

arthritis. (Tr. 193). Plaintiff reported, however, that he takes no medications for these impairments and does not check his blood sugars. Plaintiff reported that following gastric bypass surgery his blood sugars "seem to be better controlled." *Id.* Plaintiff exhibited normal gait and motor function. (Tr. 194). An examination of Plaintiff's knees revealed tenderness, decreased range of motion, and evidence of bony enlargement. There was no evidence, however, of inflammation or tenderness in any of Plaintiff's other joints. *Id.* An examination of Plaintiff's back revealed "some tenderness" in the lower lumbar area with slightly reduced range of motion. (Tr. 194, 196). The results of the examination were otherwise unremarkable. (Tr. 194). Dr. Keaveney concluded that Plaintiff suffered from (1) diabetes - controlled by diet, (2) degenerative joint disease, and (3) hypertension - well controlled with medication. (Tr. 195).

On March 14, 2001, Plaintiff participated in an ophthalmological examination, the results of which revealed no evidence of diabetic retinopathy. (Tr. 378).

Treatment notes dated April 20, 2001, indicate that Plaintiff had lost approximately 100 pounds since undergoing gastric bypass surgery. (Tr. 277).

On October 12, 2001, Plaintiff participated in an initial psychiatric evaluation conducted by Beth McWhorter. (Tr. 470-71). Plaintiff appeared anxious, but exhibited coherent thought processes and above average intelligence. (Tr. 471). Plaintiff's energy and motivation were "okay." *Id.* Plaintiff was diagnosed with generalized anxiety disorder and his GAF score was rated as 55.[4] (Tr. 470). His prognosis was characterized as "fair-good." *Id.*

---

[4] A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

On April 30, 2002, John Braccio, Ph.D. authored a letter regarding Plaintiff's impairments. (Tr. 246-47). The doctor reported that Plaintiff suffers from anxiety and depression as a result of "his many physical problems" and feelings of low self-esteem. (Tr. 246). The doctor concluded that he could not "imagine [Plaintiff] again being able to work." Dr. Braccio acknowledged, however, that he had been treating Plaintiff for only six months. *Id.*

At the administrative hearing Plaintiff testified that he suffers from carpal tunnel syndrome, as well as "osteoarthritis in my entire body." (Tr. 520-21). Plaintiff testified that "all the joints in [his] body are. . .swollen and painful." (Tr. 538). Plaintiff reported that he experiences panic attacks, but that with medication they are "under control." (Tr. 530-31). He reported that as long as he takes his medication he does not experience "breakdowns" or emotional instability. (Tr. 546-47). Plaintiff testified that his previous work required him to perform "fairly sophisticated documents preparation and presentations," but that he "would never be able to do [that] again." (Tr. 531). Plaintiff testified that he can walk approximately one block, stand in one place for 20 minutes, and lift ten pounds. (Tr. 536-38).

Plaintiff testified that his whistle-blower lawsuit against the State of Michigan was settled for "a substantial amount of money." (Tr. 523). Plaintiff reported that he had also received a sizable settlement of a worker's compensation claim. (Tr. 523-24). Plaintiff testified that he took this money and invested it in various properties which he was in the process of rehabilitating. (Tr. 524-25). Plaintiff testified that in 1998 he helped developed the idea to create a company in which he would partner with his attorney to perform environmental consulting. (Tr. 529). He indicated, however, that the plan "never came to pass." *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations provide a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[5] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if an individual suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

In his decision denying Plaintiff's claim for benefits, the ALJ determined that Plaintiff suffers from the following severe impairments: (1) anxiety-related disorder, (2) high blood pressure, (3) degenerative joint disease, (4) bilateral carpal tunnel syndrome, and (5) diabetes. (Tr. 47). The ALJ further determined, however, that these impairments, neither alone nor in combination, satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R.,

---

[5] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

Part 404, Subpart P, Appendix 1. *Id.* The ALJ found that Plaintiff retained the ability to perform his past relevant work, but further determined that even if Plaintiff was unable to perform his past relevant work there existed a significant number of jobs which he could perform despite his limitations. (Tr. 49-50). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work activities subject to the following limitations: (1) he can lift/carry 20 pounds occasionally and 10 pounds frequently, (2) he must be able to sit or stand as needed, (3) he can only occasionally balance, stoop, kneel, crouch, crawl, or climb stairs/ramps,

(4) he must avoid exposure to hazards and walking on uneven surfaces, and (5) he can only occasionally use his upper extremities. (Tr. 48-49). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could perform his past relevant work as a resource specialist performing environmental analyses. While the record supports the conclusion that Plaintiff could perform the exertional requirements of this position, the record also reveals that Plaintiff's anxiety disorder, while not preventing him from performing all work activities, would prevent him from performing all the requirements of this position. In sum, the ALJ's determination that Plaintiff can perform his past relevant work is not supported by substantial evidence.

The ALJ also determined, however, that even if Plaintiff could no longer perform his past relevant work, there existed a significant number of jobs which he could nonetheless perform. Having determined (in the alternative) that Plaintiff could no longer perform his past relevant work, the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could have performed, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt

14

to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Rich Riedl.

The vocational expert testified that there existed approximately 19,400 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 553-54). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

　　　　a.　The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts that the ALJ improperly failed to accord controlling weight to certain opinions expressed by his treating physicians. Plaintiff further asserts that when properly evaluated these opinions support the conclusion that he is disabled.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and his maladies generally possess significant insight into his medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ is not bound by conclusory statements, particularly when unsupported by detailed objective criteria and documentation. *See Cohen*, 964 F.2d at 528. Finally, the ALJ need not defer to an opinion contradicted by substantial medical evidence. *See Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

Plaintiff first cites the opinion expressed by Dr. Picone. On May 6, 2000, Plaintiff met with Dr. Picone as part of a psychiatric consultation. (Tr. 159-60). Plaintiff reported that he felt "overwhelmed" with difficulties he was experiencing attempting to renovate several houses and was experiencing decreased energy and stress related to his "uncontrolled blood sugars." (Tr. 159). Plaintiff nonetheless reported that he was seeking employment as an instructor at a local community college. *Id.* He exhibited "normal" posture, gait, and motor activity and the results of a mental status examination were unremarkable. (Tr. 160). Plaintiff was diagnosed with adjustment disorder with mixed emotional features and his GAF score was rated as 53. *Id.* The results of this examination, while supporting the conclusion that Plaintiff's ability to perform work activities is somewhat limited, is not inconsistent with the ALJ's RFC determination.

Plaintiff next relies on the results of an April 16, 2001 evaluation performed by an unidentified individual. (Tr. 253-58). The examiner's notes reveal that Plaintiff was not experiencing any particular difficulty, but instead simply required assistance with "medicine management." (Tr. 256). As Plaintiff testified at the administrative hearing, so long as he takes his medication he does not experience breakdowns or emotional instability. (Tr. 546-47). Plaintiff makes much of the fact that the examiner rated his GAF score as 50.[6] However, there is nothing in

---

[6] A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social,

the examiner's notes supporting this conclusion. Furthermore, while there is no question that Plaintiff is somewhat impaired, the record does not support the conclusion that he is impaired to such an extent.

Plaintiff next cites to the results of an October 29, 2001 examination conducted by Dr. Vigor. (Tr. 465-67). The notes relating to this examination consist almost exclusively of Plaintiff's subjective complaints. Plaintiff finds it significant that Dr. Vigor reported that "Pt. disabled, needs consideration of disability." (Tr. 467). First, the determination of disability is a matter reserved to the Commissioner. Furthermore, there is nothing in the notes of this examination supporting the conclusion that Plaintiff is impaired to an extent beyond that recognized by the ALJ. Finally, the statement that Plaintiff is disabled is inconsistent with the doctor's contemporaneous treatment notes. (Tr. 447-71). While these records reveal that Plaintiff is impaired to a certain degree they do not support the conclusion that Plaintiff is impaired to an extent greater than that recognized by the ALJ.

Finally, Plaintiff relies on the opinion expressed by Dr. Braccio in an April 30, 2002 letter to the ALJ. (Tr. 246-47). In this letter, the doctor states that he "cannot imagine [Plaintiff] again being able to work." (Tr. 246). The doctor also noted the "huge" fall Plaintiff experienced professionally. *Id.* Because the record contains none of the doctor's contemporaneous treatment notes, his opinion is little more than a conclusion unsupported by any medical evidence. The Court does not dispute that Plaintiff has experienced a significant professional setback. However, the relevant question is not the extent of Plaintiff's professional setback, but rather whether he possesses the ability to perform other work which exists in significant numbers in the economy. The

---

occupational, or school functioning." DSM-IV at 34.

conclusion that Plaintiff is incapable of performing *any* other work is simply not supported by the medical evidence.

As Plaintiff testified, so long as he takes his medication his depression and anxiety are well controlled. Such is inconsistent with his assertions of disability, as is the extensive evidence of Plaintiff's varied work and leisure activities. In sum, there exists substantial evidence to support the ALJ's decision to accord less than controlling weight to these particular opinions.

b. The Alleged Failure by the ALJ to Identify all of Plaintiff's Severe Impairments

Plaintiff asserts that the ALJ's decision must be overturned because he failed to identify all the severe impairments from which he suffers. Specifically, Plaintiff asserts that the ALJ failed to identify the following impairments as severe: (1) adjustment disorder, (2) major depressive disorder, (3) chronic respiratory insufficiency, (4) obesity, (5) obstructive sleep apnea, (6) idiopathic angioedema, (7) hiatal hernia, (8) fatigue, and (9) hyperlipidemia.

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment does not constitute reversible error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th Cir. 1987); *Ortiz-Rosado v. Comm'r of Soc. Sec.*, 2001 WL 700835 at *1 (6th Cir., June 12, 2001).

Here, the ALJ determined that Plaintiff suffered from severe impairments at step two of the sequential analysis and continued with the remaining steps thereof, noting that he gave "careful consideration" to "the entire record." (Tr. 50). This sufficiently indicates that the ALJ properly considered the combined effect of Plaintiff's various impairments. *See Loy v. Sec'y of Health and Human Services*, 901 F.2d 1306, 1310 (6th Cir. 1990) (citing *Gooch v. Sec'y of Health and Human Services*, 833 F.2d 589, 591-92 (6th Cir. 1987)). A review of the ALJ's decision reveals that he considered and evaluated the entire record in this matter.

Thus, even if the Court assumes that the ALJ erred in failing to find that certain other of Plaintiff's impairments are severe, such does not call into question the substantiality of the evidence supporting the ALJ's decision. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

    c.  <u>The ALJ Properly Considered Plaintiff's SSI Claim</u>

Finally, Plaintiff claims that the ALJ did not give "adequate consideration" to his SSI claim. Plaintiff asserts that the ALJ improperly concluded that he had to establish that he was

19

disabled prior to December 31, 1988, to qualify for either SSI or DIB benefits.  As Defendant correctly notes this claim is based on a selective reading of the ALJ's decision.  Regarding Plaintiff's DIB claim, the ALJ stated the following:

> With regard to the claim for a period of disability and Disability Insurance Benefits, the claimant meets the nondisability requirements set forth in Section 216(i) of the Social Security Act and is insured for disability benefits through December 31, 1988.  Therefore, the claimant must establish disability on or prior to this date.

(Tr. 43).

As this passage reveals, the comment that "the claimant must establish disability on or prior to this date" applies only to Plaintiff's DIB claim.  Moreover, the fact that the ALJ analyzed and evaluated the entire medical record - including treatment records dated 14 years after the expiration of Plaintiff's insured status - supports the conclusion that the ALJ properly considered Plaintiff's SSI claim.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, the Commissioner's decision is **affirmed**.  A judgment consistent with this opinion will enter.

Date:  September 13, 2005             /s/ Ellen S. Carmody
                                      ELLEN S. CARMODY
                                      United States Magistrate Judge